**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALAN GROSS,<br>2501 Porter Street NW<br>Apt. 116<br>Washington, D.C. 20008<br><br>and<br><br>JUDITH GROSS,<br>2501 Porter Street NW<br>Apt. 116<br>Washington, D.C. 20008<br><br>    Plaintiffs,<br><br>    v.<br><br>DEVELOPMENT ALTERNATIVES, INC.,<br>7600 Wisconsin Avenue<br>Suite 200<br>Bethesda, Maryland 20814<br><br>and<br><br>THE UNITED STATES OF AMERICA,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)  Case No: 12-1860<br>)<br>)<br>)  JURY DEMAND<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT**

   Plaintiffs Alan Gross and Judith Gross, by and through undersigned counsel, hereby file

this Complaint against Defendants, Development Alternatives, Inc. ("DAI") and the United

States of America (the "United States"), for damages arising from tortious conduct committed

against them by Defendants, and allege as follows:

**INTRODUCTION AND NATURE OF THE ACTION**

   Plaintiff Alan Gross, a United States citizen who was born and raised in this country, has

been imprisoned in Cuba since December 3, 2009. Mr. Gross is imprisoned in Cuba due to his

work on a project that Defendant United States negligently directed, organized, and oversaw, and that Defendant DAI, the government contractor chosen for the project, conducted not only negligently, but also with gross negligence and a willful disregard for Mr. Gross' rights and safety. The project, which was intended to increase the availability of internet access in Cuba, required that Mr. Gross make several trips there, the fifth of which resulted in his wrongful arrest and detention. Unless Mr. Gross's wife, Plaintiff Judith Gross, succeeds in her efforts to secure his earlier release, Mr. Gross likely will remain imprisoned in Cuba for another 12 years, the remainder of the 15-year sentence that the Cuban government imposed on him.

As discussed further below, Mr. Gross' arrest and imprisonment were entirely avoidable, and are due to the tortious conduct of the Defendants. Among other things, both before and after Mr. Gross began traveling to Cuba, Defendants failed to disclose adequately to Mr. Gross the superior knowledge that they had, or should have had, about the material risks that Mr. Gross faced due to his participation in the referenced project. Defendants also failed, in response to that knowledge, to take basic remedial measures to protect Mr. Gross, including failing to provide Mr. Gross with the education and training that was necessary to minimize the risk of harm to him, and failing to call him back from Cuba and/or preclude him from returning there.

Worse, Defendant DAI, with negligence, gross negligence and willful disregard for Plaintiffs' rights, failed to take these basic remedial steps because doing so would have delayed or prevented DAI's complete performance under part of a lucrative contract with Defendant United States, thereby depriving Defendant DAI of significant revenue. Indeed, upon information and belief, Defendant DAI's business model depends upon obtaining and performing contracts with Defendant United States.

Defendant DAI engaged in this behavior – putting profits before safety – despite having, along with Defendant United States, superior knowledge regarding the risks posed to Mr. Gross, and despite being the entity that primarily interacted with Mr. Gross on the project. Indeed, on several occasions during the project, Mr. Gross expressed concerns about the operation. DAI did nothing in response, choosing, instead, simply to forward those concerns to Defendant United States, while DAI continued to make money. Rather than protecting Mr. Gross, DAI responded to Mr. Gross by pressuring him to finish the project or to find someone else who would.

Moreover, in failing to fulfill its own duties to Mr. Gross, Defendant United States, and specifically its U.S. Agency for International Development ("USAID"), failed to follow mandatory, internal directives that governed the referenced project. These directives, among other things, govern both the planning of USAID projects and foreign travel in connection with such projects, particularly to hostile countries like Cuba. Upon information and belief, these directives include instructions about the warnings, education, training and protection that are to be provided to personnel, who travel to high-risk places like Cuba in connection with USAID projects. Yet, when USAID learned of Mr. Gross' concerns from DAI as noted above, USAID also did nothing.

Since Mr. Gross's wrongful arrest and detention in Cuba, Mr. and Mrs. Gross have suffered immensely. Mr. Gross resides in a 10-by-12 foot room with two other inmates, he has lost over 100 pounds, and he is battling chronic arthritis pain and what appears to be a cancerous tumor beneath his shoulder blade. His business and career have been destroyed, and his family has been deprived of their primary wage earner. Mrs. Gross has lost her husband, and she consequently, along with her husband, has suffered a loss of consortium. While Mr. Gross remains confined in Cuba, his oldest daughter has been battling breast cancer and his mother has

been suffering from terminal lung cancer. At this time, there are no indications that Mr. Gross

will return to his family within the next decade. Plaintiffs' suffering and loss continues unabated.

Accordingly, Plaintiffs bring this action against Defendant United States, pursuant to the

Federal Tort Claims Act ("FTCA"), and against Defendant DAI, pursuant to common law, for

negligence, gross negligence, negligent infliction of emotional distress, and loss of consortium.

Plaintiffs also seek punitive damages from DAI, for its willful disregard of their rights.

## **PARTIES**

1.      Plaintiff Judith Gross, Alan Gross' wife, is a citizen of the District of Columbia

who resides at 2501 Porter Street NW, Apt. 116, Washington, D.C. 20008.

2.      Mrs. Gross became domiciled in the District of Columbia during the summer of

2010, shortly after Mr. Gross' detention in Cuba. Specifically:

      a.      In May 2010, Mrs. Gross sold the home that she and Mr. Gross jointly owned in

            Maryland; Mrs. Gross sold the house on behalf of both herself and Mr. Gross

            pursuant to a power of attorney that Mr. Gross granted to her;

      b.      In May 2010, Mrs. Gross moved to the District of Columbia, where she has since

            resided;

      c.      Shortly after moving to the District of Columbia, Mrs. Gross relinquished the

            Maryland license plates and registration for the vehicle that she and Mr. Gross

            jointly own, and registered the vehicle in the District of Columbia, where it

            remains registered;

      d.      Mrs. Gross also obtained, and still maintains, a District of Columbia driver's

            license;

      e.      Mrs. Gross is registered to vote in the District of Columbia;

f.      Since moving to the District of Columbia, Mrs. Gross has been paying District of

Columbia payroll taxes; and

g.      Since moving to the District of Columbia, Mrs. Gross, on behalf of herself and

Mr. Gross (pursuant to the referenced power of attorney), has filed tax return

extension forms with the United States and District of Columbia governments,

and listed the above-referenced District of Columbia address as the address for

both herself and Mr. Gross.

3.      Plaintiff Alan Gross, the husband of Plaintiff Judith Gross, also is a citizen of the

District of Columbia. Given his current exceptional circumstances, namely, his incarceration in

Cuba, Mr. Gross is not currently able to live with Mrs. Gross at their District of Columbia

residence.

4.      Mr. Gross intends to reunite with his wife and live with her at their District of

Columbia residence upon his release from Cuba and, in anticipation of that reunion, he has taken

actions to relinquish his former domicile in Maryland and to establish his domicile in the District

of Columbia. Specifically, as noted, Mr. Gross executed a power of attorney allowing Mrs. Gross

to act on his behalf. Pursuant to that power of attorney, Mr. Gross, among other things, (a) sold

the home in Maryland that he jointly-owned with Mrs. Gross, (b) turned in the Maryland license

plates and registration for the vehicle that he and Mrs. Gross jointly own, and had the vehicle

registered in the District of Columbia, where it remains registered, and (c) filed tax return

extension forms with both the United States and District of Columbia Governments, listing the

above-referenced District of Columbia address as the address for both himself and Mrs. Gross.

5.      DAI is a Maryland corporation headquartered at 7600 Wisconsin Avenue, Suite

200, Bethesda, Maryland 20814.

5

6.      DAI is a private consulting firm and government contractor that was founded in 1970 and that specializes in international development. DAI has approximately 1500 employees worldwide, including in the Caribbean. DAI has worked extensively with USAID on numerous projects over an extended period, only one of which was the Cuba project at issue. Indeed, several DAI executives are former USAID officials.

7.      Upon information and belief, Defendant DAI is dependent on USAID for the vast majority of its business. DAI's contracts with USAID generate a tremendous amount of revenue for the company. For example, in 2009, upon information and belief, approximately $333 million, which was more than three-quarters of DAI's annual revenue, was derived from USAID projects.

8.      Since 2007, upon information and belief, DAI has ranked as one of USAID's top contractors by revenue, consistently earning approximately $300 million per year.

9.      Defendant United States of America is sued on account of the tortious conduct of employees of USAID.

10.      Upon information and belief, USAID's headquarters is located exclusively in the Ronald Reagan Building, at 1300 Pennsylvania Avenue NW, Washington, D.C. 20523, or, alternatively, primarily in that building and also at a handful of other facilities in Washington, D.C.

11.      Upon information and belief, unlike other federal agencies, such as the Bureau of Prisons, that have offices throughout the United States in addition to their headquarters, USAID's headquarters in the District of Columbia is USAID's only office in the United States and/or is the place where USAID not only *formulates and initiates* its policies and practices, but also where USAID *implements* its decisions.

12.     Among other things, upon information and belief, every significant USAID bureau operates out of the agency's Washington D.C. headquarters; these bureaus include the Bureau for Latin America and the Caribbean, which was the USAID bureau responsible for the Cuba project at issue, and the so-called "Office of Security," which, among other things, is responsible for "developing and conducting travel-related pre-briefings and debriefings" and otherwise addressing the security of USAID personnel who travel abroad in connection with USAID projects. *See* USAID website, http://www.usaid.gov/who-we-are/organization/independent-offices/office-security (last visited Nov. 15, 2012).

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over the claims against the United States pursuant to 28 U.S.C. §§ 1346(b), 2671−2680. Pursuant to 28 U.S.C. § 2675, on December 2, 2011, within two years after their claims accrued, Plaintiffs each filed administrative claims with USAID. The claims were denied by USAID in a letter dated May 22, 2012. This action is timely filed against and served on Defendant United States within six months of the mailing of USAID's denial letter.

14.     This Court has subject matter jurisdiction over the claims against DAI  based on two independent grounds: (1) pursuant to 28 U.S.C. § 1367(a), because the claims are sufficiently related to the claims against the United States that this Court has pendent subject matter jurisdiction over the claims against DAI; and (2) based on diversity of citizenship, pursuant to 28 U.S.C. 1332(a), because Plaintiffs are citizens of the District of Columbia, DAI is a citizen of Maryland, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

15.     This Court has personal jurisdiction over the United States because (a) USAID is headquartered in the District of Columbia, (b) USAID engages in a regular course of conduct in the District of Columbia, including most, if not all, of the conduct at issue in this action, and (c) USAID has tortiously caused injury in the District of Columbia to District of Columbia citizens.

16.     This Court has personal jurisdiction over DAI because (a) it regularly solicits and conducts business in the District of Columbia, such as contracts with USAID, including the two agreements with USAID that are at issue in this action, (b) a portion of DAI's conduct at issue in this action occurred in the District of Columbia, and (c) DAI has tortiously caused injury in the District of Columbia to District of Columbia citizens.

17.     Venue is proper in this Court as to the United States pursuant to 28 U.S.C. § 1402(b) because the Plaintiffs are citizens of, and reside in, the District of Columbia and because most, if not all, of the United States' actions and omissions complained of herein occurred in the District of Columbia. Among other things, upon information and belief, as noted above, the formulation, initiation, and implementation of the USAID policies, practices and decisions complained of herein occurred in the District of Columbia.

18.      Venue is proper in this Court as to DAI pursuant to 28 U.S.C. § 1391(b) because a substantial number of the actions, omissions, and events giving rise to Plaintiffs' claims occurred in the District of Columbia, and because DAI is subject to personal jurisdiction in the District of Columbia as described in paragraph 16 *supra*.

## FACTUAL BACKGROUND

**A.  USAID's Role in the Cuba Program At Issue And Its Agreements With DAI**

USAID's Mission

19.     In 1996, Congress passed, and President Clinton signed, the Cuban Liberty and

Democratic Solidarity (Libertad) Act of 1996, 22 U.S.C. § 6039, commonly known as the

"Helms-Burton Act."

20.     Established in 1961, USAID is one of the United States Government agencies

tasked with implementing statutes such as the Helms-Burton Act.

21.     USAID's "Cuba Democracy and Contingency Planning Program" (the "Cuba

Program") was developed pursuant to the Helms-Burton Act.

22.     USAID's Cuba Program was "expressly designed to hasten Cuba's peaceful

transition to a democratic society." Task Order No. DFD-I-03-00250-00 ("Cuba Task Order") at

B.1.[1] One of its objectives is to "[d]evelop and . . . activate plans for launching a rapid-response

programmatic platform that will meet USAID's interest for having and coordinating an on-island

presence." *Id.*

The Mandatory, Internal Directives Governing USAID Operations, Including the Cuba
Program

23.     As USAID acknowledges on its website, although information about USAID's

programs is generally available to the public, USAID operations often necessitate "access to

sensitive and sometimes classified information provided by other federal departments and

agencies."  *See* USAID website, http://www.usaid.gov/who-we-are/organization/independent-

offices/office-security (last visited Nov. 15, 2012).

---

[1] Upon information and belief, Defendants possess complete copies of the Cuba Task Order.

24.     USAID personnel "can be the target of foreign intelligence services," and thus such personnel "must be made aware of the techniques used by [such] organizations…so that they can properly protect . . . themselves . . . ." *Id.*

25.     USAID's Office of Security thus is charged with "1) educating employees on the threat posed by foreign intelligence to USAID domestic and international operations; 2) developing and conducting travel related pre-briefings and debriefings and 3) conducting counterintelligence training for new and existing employees." *Id.*

26.     The Office of Security performs this function "in accordance with a number of laws, Presidential orders, Executive Branch-issued guidance as well as policy established by the Department of State." *Id.*

27.     One such set of rules that governs USAID projects is a network of electronic inter-agency manuals known as the Automated Directives System ("ADS").

28.     Upon information and belief, many ADS provisions are confidential and thus not accessible to the public.

29.     Upon information and belief, several of these ADS provisions also contain mandatory directives regarding how USAID conducts programs such as the Cuba Program.

30.     On its website, USAID notes that "Each chapter [of ADS] is further enhanced by both mandatory and non-mandatory references…." USAID website, http://www.usaid.gov/who-we-are/agency-policy/about-ads (last visited Nov.15, 2012).

31.     For example, ADS Chapter 569 ("Counterintelligence Manual") lays out directives for USAID's counterintelligence program and refers to a network of information that is not available to the public. The manual sets forth mandatory requirements for (1) educating USAID personnel regarding foreign threats, and (2) reporting by personnel who learn of, among other

things, "attempted or actual espionage, subversion, sabotage, terrorism or extremist activities directed against USAID and its personnel, facilities, resources, and activities." Counterintelligence Manual at 3.

32.     In particular, the "Foreign Travel" section of the Counterintelligence Manual indicates that USAID must adjust counterintelligence education and training for personnel based on the threat level of the country to which they are traveling. Both the country's threat level and accompanying counterintelligence education and training requirements are confidential:

> "Post threat levels are listed in the Security Environment Threat List (SETL) which is a classified document published by [Department of State] on a semi-annual basis that defines the [counterintelligence] program requirements at post. The SETL is available on the classified network via links on the State Department's Web site and is also maintained by [the Office of Security]. If personnel do not have access to the classified network, personnel must consult with [the Office of Security] to determine threat-level listed in the SETL." *Id.* at 14.

33.     Section 569.2 of the manual ("Primary Responsibilities") also states that USAID's Office of Human Resources is responsible for "[p]roviding a list of proposed overseas assignees to [the Office of Security] to allow for review of assignments to Critical Human Intelligence (HUMINT) threat posts and [counterintelligence] awareness training prior to departure." *Id.* at 4.

34.     USAID also is required to maintain security oversight in each country in which it operates. Specifically, the USAID Director of Security is responsible for "providing oversight of the USAID Counterintelligence (CI) Program," and "forwarding information on matters that require a referral to the Federal Bureau of Investigation and coordination with USAID General Counsel." *Id.* at 3-4.

35.     As discussed below, upon information and belief, not only did USAID have safety-related obligations in connection with the Cuba Program, USAID also gave Defendant DAI access to much of the same confidential information that USAID used to fulfill these

obligations, so that DAI could fulfill its independent obligations to manage and implement various aspects of the program for USAID.

The "Prime Contract" Between USAID and DAI

36.     As noted, DAI has had extensive business dealings with USAID that have encompassed multiple contracts and projects.

37.     One such contract between DAI and USAID, that led to the Cuba project at issue, was an agreement dated September 27, 2005 entitled the "Instability, Crisis and Recovery Programs Prime Contract No. DFD-I00-05-00250-00," (the "Prime Contract").[2]

DAI's Responsibilities Under the Prime Contract

38.     Under the Prime Contract, DAI had responsibility for several critical functions, including primary management and implementation of specific "task orders" (or projects) issued pursuant to the Prime Contract.

39.     Specifically, in conjunction with those task orders, DAI was tasked with, *inter alia*, the following responsibilities:

a.    DAI was "required to conduct conflict and fragility assessments, which includes review of risk factors relevant to specific countries or regions, development of work plans, completion of research, fieldwork and reports, planning and implementation of meetings, workshops and conferences to consider follow-up on assessment findings and recommendations." Prime Contract at 15;

b.   DAI was "required to participate in or be responsible for the development of training syllabi, implementation of the training programs and monitoring of the application of training lessons by the participants." *Id.* at 19; and

---

[2] Upon information and belief, Defendants possess complete copies of the Prime Contract.

    c.  DAI could be "asked to participate in or be responsible for the design and implementation of monitoring and evaluation efforts for [USAID] on specific conflict issues." *Id.* at 22.

    40.   Upon information and belief, to enable DAI to perform these and other important functions, Defendant United States provided DAI access to confidential information. For example, DAI employees requiring access to confidential information were subject to "an appropriate level background investigation by the Defense Security Service (DSS)." *Id.* at 38.

<u>USAID's Right of Oversight Under the Prime Contract</u>

    41.   Under the Prime Contract, USAID remained responsible for directing and overseeing various aspects of specific projects or task orders undertaken pursuant to the Prime Contract. Specifically:

    a.  USAID was obligated to provide "technical direction" to DAI, which included providing "directions to [DAI] which fill in details, suggest possible lines of inquiry, or otherwise facilitate completion of work." *Id.* at 34;

    b.  USAID's Mission Administrative Officer was supposed to receive from DAI certain information for every contract employee or dependent "on or before their arrival in the host country." *Id.* at 37;

    c.  USAID approval was required "for all international travel directly and identifiably funded by USAID under [the Prime Contract]." *Id.* at 42. DAI was therefore required to share with USAID "an itinerary for each planned international trip, showing the name of the traveler, purpose of the trip, origin/destination (and intervening stops), and dates of travel . . . ." *Id.*

42.     Under the Prime Contract, USAID was required to request work from DAI through the issuance of specific task orders. *Id.* at 4.

The Cuba Task Order at Issue

43.     As part of the Cuba Program referenced above, Defendant United States asked DAI to come up with a proposal for providing humanitarian support to various groups within the Cuba population (the "Cuba Project").

44.     Consistent with its economic dependency on USAID, DAI quickly complied and proposed the Cuba Task Order, which was approved by USAID on August 14, 2008.

DAI's Responsibilities Under the Cuba Task Order

45.     The Cuba Task Order tasked DAI with responsibility for day-to-day management and implementation of the Cuba Project. Specifically, among other things:

a.   DAI "shall have the primary responsibility for ensuring that activities conducted under [the Cuba Project] contribute to USAID's assistance strategy for Cuba and achieve the anticipated results."  Task Order at C.2.K;

b.   DAI was empowered to deploy to Cuba and "establish operations supporting the creation of a USAID Mission."  *Id.* at C.2.D; and

c.   In consultation with USAID officials, DAI was to "identify areas of program management responsibility and hire staff to assist with specific tasks to support USAID's Cuba program …."  *Id.* at C.2.F.

46.     Further, as with the Prime Contract, upon information and belief, DAI was given access to confidential information in connection with the Cuba Task Order. *See id.* at C.2.M.

<u>USAID's Right of Oversight Under the Cuba Task Order</u>

47.    Under the Cuba Task Order, as with the Prime Contract, USAID maintained the right, and duty, to direct and oversee the Cuba Project. Specifically, and among other things:

a.   "[USAID's Cuba Program Office] will maintain the right to redirect activities in response to USAID program and strategy requirements, changes in the political situation, or regulatory changes." *Id.* at C.2.L(D);

b.   USAID is to receive monthly reporting from DAI on, among other things, "current considerations regarding proposed activities to promote successful democratic transition." *Id.* at 25; and

c.   Moreover, USAID's Bureau for Latin America and the Caribbean is required to "provide technical oversight to [DAI] through its designated [Cognizant Technical Officer]." *Id.* at 29.

**B.    DAI's Subcontract With Plaintiff Alan Gross**

48.    Upon information and belief, as part of the Cuba Task Order, Defendant United States, through USAID, wanted to increase the availability in Cuba of new media by increasing internet access there.

49.    Upon information and belief, Defendant United States wanted to increase internet access in Cuba quickly.

50.    Upon information and belief, based on the Cuba Task Order and DAI's extensive experience with USAID, DAI officials knew the types of projects that would ultimately win USAID's approval and drive additional revenue to DAI.

51.     Consistent with this knowledge and with its economic dependence on USAID, upon information and belief, DAI assured USAID that DAI could move quickly to perform the task of increasing internet access in Cuba.

52.     Upon information and belief, Defendant DAI had worked with Mr. Gross previously on unrelated projects; those projects did not require the skill set, such as fluency in Spanish, that was or should have been required for this particular project.

53.     Nonetheless, Defendant DAI began discussions with Plaintiff Alan Gross, a 59-year old Jewish American businessman who did not speak Spanish, about working on the project.

54.     DAI management initially communicated with Mr. Gross in the Fall of 2008 about the possibility of his working on the Cuba Task Order and, on October 31, 2008, submitted a "Request for Proposal" to him.

55.     DAI's "Request for Proposal" included a "Statement of Work" that detailed the types of proposals DAI was seeking in its effort to satisfy USAID's requirement to increase access to "new media" in Cuba, stating that:  "[the subcontractor] shall design and implement new media initiatives that will stimulate and strengthen the effectiveness of a range of civil society actors in Cuba . . . to  participate in local decision making and problem solving . . . . The initiative(s) should focus on increasing the communication and understanding of events on the ground in Cuba; [including] breaking down barriers to Cuban citizens' access to information . . . ."  DAI Request for Proposal at 6.

56.     Mr. Gross submitted a detailed response to DAI's Request for Proposal on November 7, 2008 ("Response to RFP").

57.     Mr. Gross' proposal contemplated training the Jewish community in Cuba on the use and maintenance of information and communication technologies ("ICTs") through, among other things, the use of mobile phones, wireless technologies, and personal computers (the "Cuba ICT Project").

58.     Mr. Gross' proposal reflected his lifelong dedication, both professionally and personally, to serving Jewish causes around the world.

59.     As part of the Cuba ICT Project, it was contemplated that Mr. Gross would travel to Cuba on multiple occasions. Once in Cuba, Mr. Gross was to interface with various members of the Cuban Jewish community for purposes of configuration, logistics, training, and implementation.

60.     Upon information and belief, DAI solicited bids from other prospective offerors in addition to Mr. Gross. Upon receipt of proposals, DAI selected the proposals, including the proposal submitted by Mr. Gross, that it would provide to USAID for review and evaluation.

61.     USAID had the right to approve both the selection of Mr. Gross as DAI's subcontractor and the terms of the proposed subcontract, including the scope of work.

62.     Upon information and belief, USAID did in fact approve Mr. Gross as DAI's subcontractor and the terms of the subcontract, including the scope of work.

63.     Thus, Mr. Gross, through the entity JBDC LLC, of which he was the sole member and employee, entered into a subcontract with DAI on February 10, 2009 (the "Subcontract").[3]

64.     Upon information and belief, because JBDC is a single-member LLC, the Internal Revenue Service has treated JBDC as a sole proprietorship for tax purposes.

---

[3] Upon information and belief, Defendants possess complete copies of the Subcontract.

65.     Per DAI's instructions, Mr. Gross, working in consultation with DAI management and subject to USAID approval, developed and implemented the Cuba ICT Project to increase internet access in Cuba.

66.     The Subcontract stated that "[t]he pilot [project] will diminish portions of the information blockage by – on a limited test basis – establishing internet connections using multiple redundant devices in order to improve intra and intergroup communications channels. The pilot will . . . [e]nable target beneficiaries via training to use ICT devices to connect to the internet so that they can have regular and direct contact with each other and with JBDC, as well as enable access to a large volume [of] data and information not previously accessed . . . ." Subcontract at 19.

67.     Consistent with DAI's economic dependence on USAID, the Subcontract also provided that: "DAI and [Mr. Gross] recognize that time is of the essence with respect to performance of the subcontract and there is potential for financial loss by DAI in the event that [Mr. Gross] fails to complete the Work." *Id.* at 2.

68.     Under the Subcontract, DAI representatives were responsible for technical direction of the Cuba ICT Project, including providing "(i) directions to [Mr. Gross] which direct or redirect the Subcontract effort, shift work emphasis between work areas or tasks, require pursuing of certain lines of inquiry, fill in details or otherwise serve to accomplish the Subcontract Statement of Work, (ii) furnishing information to [Mr. Gross] which assists in the interpretation of specifications or technical portions of the Subcontract Statement of Work, and (iii) review and, where required by the Subcontract, approv[e] of technical reports, specifications, and technical information to be delivered by [Mr. Gross] to DAI under this Subcontract."  Subcontract at 5-6.

69.     Throughout the course of the Cuba ICT Project, Mr. Gross worked with DAI management regarding the logistics and operations of the Cuba ICT Project. On March 1, 2009, for example, preceding his first trip to Cuba, Mr. Gross submitted a final "Work Plan" and "Performance Monitoring and Evaluation Plan" to DAI outlining how he intended to accomplish the goals of the Project.

70.     DAI had the right under the Subcontract to "inspect, or otherwise evaluate" the work being performed and the premises where it was being performed. Subcontract at 8.

71.     Under the Prime Contract, the Cuba Task Order, and USAID's Automated Directives, DAI was required to communicate regularly with USAID regarding the Cuba ICT Project, including regarding Mr. Gross' trips to Cuba. *See* Prime Contract at 37, 42; Task Order at 25; ADS Section 522.1.

72.     Upon information and belief, a final copy of the Work Plan and Performance Monitoring and Evaluation Plan were provided to, and approved by, USAID.

73.     Upon information and belief, there were five modifications or amendments to the Subcontract. All of these amendments were subject to, and did receive, the ultimate approval of USAID.

74.     Upon information and belief, USAID, and the United States' diplomatic mission in Cuba, were required to communicate with each other regularly regarding Mr. Gross' trips to Cuba.

75.     Upon information and belief, Mr. Gross was not provided with the same information that Defendants USAID and DAI possessed regarding the specific risks involved in performing this kind of project in Cuba.

**C.**      **Mr. Gross' Trips to, and Ultimate Wrongful Detention in, Cuba**

76.     As discussed further below, Defendants DAI and United States breached their duty to protect Mr. Gross from specific risks that Defendants, based on their position, had the unique ability to know. Defendants also ignored Mr. Gross' own expressions of concern about the Project, opting instead to continue an operation from which Defendant DAI stood to benefit financially and that Defendant United States was committed to ideologically.

77.     Mr. Gross departed for his first trip to Cuba on March 30, 2009, during which he initiated contact and established a project site with the Jewish community in Havana. Mr. Gross returned from his first trip on April 6, 2009, and, shortly thereafter, he submitted his first trip memorandum and debriefing to DAI.

78.     Following his first visit, Mr. Gross relayed the security concerns of his Cuban contacts to DAI: "A thorough understanding concerning the sensitive nature of what was about to occur had to be reached before any participation would be ultimately committed . . . The leadership of the target group has specific concerns about government informants and the highest level of discretion is warranted."  First Trip Memo. at 7.

79.     Upon information and belief, DAI provided a copy of Mr. Gross' first trip memorandum to USAID.

80.     Defendant DAI failed to take any action to protect Mr. Gross in response to the concerns expressed in his first trip memorandum.

81.     Instead, Defendant DAI ignored these concerns, continued business as usual, and thereby continued to generate revenue from the Cuba ICT Project and other projects with USAID.

82.    Defendant United States also ignored the concerns expressed in Mr. Gross' first trip memorandum after receiving it from DAI.

83.    Instead, Defendant United States continued, without any adjustment, the Cuba ICT Project, using Mr. Gross as a pawn in its overall Cuban policy efforts.

84.    Mr. Gross departed for his second trip to Cuba on April 24, 2009. During his second visit, he established a second project site in Santiago de Cuba, located in Southern Cuba. Shortly after returning from his second trip, on May 4, 2009, Mr. Gross submitted a second trip memorandum to DAI.

85.    Mr. Gross' second trip memorandum included a section dedicated to "Managing Risk," sharing the security concerns of his contacts in Santiago de Cuba. Mr. Gross relayed to DAI that: "Essentially, the committee leader made it abundantly clear that we are all 'playing with fire' by agreeing to participate in [the Cuba ICT Project], and that we need to be extremely careful and quiet about [Cuba ICT Project] activities and to exercise discretion over with whom such activities are discussed."  Second Trip Memo. at 3.

86.    Upon information and belief, DAI provided a copy of Mr. Gross' second trip memorandum to USAID.

87.    Defendant DAI failed to take any action to protect Mr. Gross in response to the concerns expressed in his second trip memorandum.

88.    Instead, Defendant DAI ignored these concerns, continued business as usual, and thereby continued to generate revenue from the Cuba ICT Project and other projects with USAID.

89.    Indeed, on this occasion, Defendant DAI revealed the financial concerns that were driving it to ignore the risks to Mr. Gross, namely the adverse financial impact to DAI if it failed

to complete the Cuba Task Order. Specifically, on May 19, 2009, Mr. Gross spoke with DAI management regarding his second trip memorandum. After that conversation, DAI management sent Mr. Gross a follow-up memo stating: "[g]iven your concerns regarding your ability to remain on the island, please indicate in writing your contingency plan in the case you are unable to continue working on the island for whatever reason. Who will take over to see the project to completion?"

90.     Upon information and belief, DAI pressured Mr. Gross to complete the Cuba ICT Project because "time [was] of the essence with respect to performance of the Subcontract and there [was] a potential for financial loss by DAI in the event that [Mr. Gross] fail[ed] to complete the Work." Subcontract at 2.

91.     A failure by Mr. Gross to complete the work would have jeopardized not only the millions of dollars owed to DAI by USAID on the Cuba Task Order, but, upon information and belief, also would have jeopardized other existing, and future, business generally between DAI and USAID.

92.     Defendant United States also ignored the concerns expressed in Mr. Gross' second trip memorandum after receiving it from DAI.

93.     Instead, Defendant United States continued, without any adjustment, the Cuba ICT Project, using Mr. Gross as a pawn in its overall Cuban policy efforts.

94.     Mr. Gross departed for his third trip to Cuba on June 4, 2009. During his third visit, he established a project site in Camagüey in central Cuba, approximately 400 miles from Havana.

95.     Mr. Gross returned from his third trip on June 18, 2009, and submitted a third memorandum to DAI, which once again outlined the risks that the Project posed:  "This is very

risky business in no uncertain terms. Provincial authorities are apparently very strict when it comes to unauthorized use of radio frequencies . . . . Detection usually means confiscation of equipment and arrest of users." Third Trip Memo. at 7.

96.     Upon information and belief, DAI provided a copy of Mr. Gross' third trip memorandum to USAID.

97.     Defendant DAI failed to take any action to protect Mr. Gross in response to the concerns expressed in his third trip memorandum.

98.     Instead, Defendant DAI ignored these concerns, continued business as usual, and thereby continued to generate revenue from the Cuba ICT Project and other projects with USAID.

99.     Defendant United States also ignored the concerns expressed in Mr. Gross' third trip memorandum after receiving it from DAI.

100.    Instead, Defendant United States continued, without any adjustment, the Cuba ICT Project, using Mr. Gross as a pawn in its overall Cuban policy efforts.

101.    Mr. Gross departed for his fourth trip to Cuba on July 19, 2009. He returned from Cuba on August 2, 2009, and submitted his fourth trip memorandum to DAI.

102.    In his fourth trip memorandum, Mr. Gross began his section on risk with the following sentence in bold lettering: "In no uncertain terms, this is very *risky* business." To illustrate the risks involved, he described an incident during which Cuban customs officials attempted to seize some of his team's equipment when they arrived at the airport in Havana. Fourth Trip Memo. at 5. He described efforts by Cuban authorities to detect or "sniff out" wireless networks and other unauthorized radio frequency use, especially outside of Havana. *Id.*

at 6. He reiterated that the detection of these networks could result in arrests of his contacts there. *Id.*

103.    Upon information and belief, DAI provided a copy of Mr. Gross' fourth trip memorandum to USAID.

104.    Defendant DAI failed to take any action to protect Mr. Gross in response to the concerns expressed in his fourth trip memorandum.

105.    Instead, Defendant DAI ignored these concerns, continued business as usual, and thereby continued to generate revenue from the Cuba ICT Project and other projects with USAID.

106.    Defendant United States also ignored the concerns expressed in Mr. Gross' fourth trip memorandum after receiving it from DAI.

107.    Instead, Defendant United States continued, without any adjustment, the Cuba ICT Project, using Mr. Gross as a pawn in its overall Cuban policy efforts.

108.    On September 17, 2009, DAI submitted a proposal to USAID for follow-on activities for the Cuba ICT Project. These follow-on activities both extended the term, and expanded the scope of, the Cuba ICT Project. USAID consented to these follow-on activities on October 8, 2009, approving additional funding for the Project. Upon information and belief, USAID's approval of the DAI proposal for follow-on activities resulted in additional revenue for DAI.

109.    Although Mr. Gross agreed with the idea of follow-on activities, the proposal for such activities represented a concrete opportunity for both Defendant DAI and Defendant United States to leverage their superior knowledge and position and take basic measures to protect Mr.

Gross, like foregoing, or at least delaying, the follow-on activities, or providing additional disclosures, education, training, and protection to Mr. Gross.

110.   Yet, upon information and belief, DAI, for pecuniary reasons, and Defendant United States, for ideological reasons, failed to take any such measures and allowed the Cuba ICT Project to continue and expand without any safety adjustments.

111.   On October 26, 2009, DAI and Mr. Gross signed Modification No. 5 to the Subcontract, revising the contract to include follow-on activities to be carried out through October 31, 2010.

112.   On November 23, 2009, Mr. Gross departed for his fifth trip to Cuba. On the evening before he was to return to the United States, December 3, 2009, Mr. Gross was arrested by Cuban authorities due entirely to the work he was performing for DAI and USAID.

113.   Mr. Gross was imprisoned, but he was not formally charged with a crime until February 2011, when he was charged with "Acts against the Independence or Territorial Integrity of the State."

114.   Initially, Mr. Gross was held in one of Cuba's most well-known prisons reserved for political prisoners. During that time, Mr. Gross was subject to extensive interrogation, sleep deprivation, and other psychological abuse.

115.   After a summary trial, on March 11, 2011, Mr. Gross was convicted and sentenced to 15 years in prison. The Cuban court determined that Mr. Gross participated in "a subversive project of the U.S. government that aimed to destroy the Revolution through the use of communications systems out of the control of [Cuban] authorities."

116.   Mr. Gross appealed his conviction, but his appeal was denied by the Cuban Supreme Court on August 4, 2011.

117.    Notwithstanding the verdict by the Cuban court, Mr. Gross' activities were entirely lawful under the laws of the United States.

**D.      The Defendants' Tortious Conduct Toward Plaintiffs**

DAI's Negligence, Gross Negligence, and Willful Disregard of Mr. Gross' Rights

118.    Defendant DAI had a duty, but failed, to take basic remedial measures to protect Mr. Gross, despite having superior knowledge, which Mr. Gross did not possess, about specific risks that Mr. Gross faced due to his participation in the Cuba ICT project. Specifically, and among other things, Defendant DAI:

   a.   failed to disclose those risks to Mr. Gross and warn him about them;

   b.   failed to provide education and training to Mr. Gross about how to avoid and otherwise address those risks, including, but not limited to, failing to develop and implement proper training programs and syllabi;

   c.   failed to provide additional protection to Mr. Gross during this trips to Cuba, including but not limited to, additional people and/or equipment;

   d.   failed to call Mr. Gross back from Cuba or prevent him from returning to Cuba once he was back in the United States;

   e.   failed to conduct proper conflict and fragility assessments, including proper reviews of risk factors relevant to Cuba and proper follow-up on assessment findings;

   f.   failed to design and implement appropriate monitoring and evaluation efforts for USAID on conflict issues that were specific to Cuba;

   g.   failed to identify and implement areas of program management responsibility and hire the appropriate staff to support tasks related to the Cuba ICT Project.

119.   Defendant DAI also, with gross negligence and in willful disregard of Mr. Gross' rights, ignored both its superior knowledge of the risks facing Mr. Gross and Mr. Gross' own expressions of concern regarding the project, because DAI, upon information and belief, was more concerned about its own financial gain. Specifically, upon information and belief, Defendant DAI was concerned about the "potential for financial loss by DAI in the event that [Mr. Gross] fail[ed] to complete the work."  Subcontract at 2.

120.   Consequently, DAI failed to take any action to address Mr. Gross' expressions of concern in his multiple trip reports, and instead pressured him to complete the project or else find someone else who could.

Defendant United States' Negligent Conduct Toward Mr. Gross

121.   Defendant United States had a duty, but failed, to take basic remedial measures to protect Mr. Gross despite having superior knowledge about specific risks that Mr. Gross faced due to his participation in the Cuba ICT project. Specifically, and among other things, Defendant United States:

a.   failed to disclose those risks to Mr. Gross and warn him about them;

b.   failed to provide education and training about how to avoid and otherwise address those risks;

c.   failed to provide additional protection to Mr. Gross during this trips to Cuba, including, but not limited to, additional people and/or equipment;

d.   failed to call Mr. Gross back from Cuba or prevent him from returning to Cuba once he was back in the United States;

e. failed to comply with all pertinent ADS provisions and all other mandatory internal directives governing the planning and conduct of the Cuba Program, the Cuba Project, and the Cuba ICT Project; and

f. improperly granted approval for the extension and expansion of the Cuba ICT Project (i.e., the follow-on activities), instead of at least delaying such activities until the risks had been addressed.

122.    In particular, and among other things, Defendant United States failed to comply with ADS Section 569—the "Counterintelligence Manual"—in at least the following respects:

a. failing to educate Mr. Gross regarding potential foreign threats;

b. failing to report threats or overt acts against Mr. Gross and his activities and/or against other activities involving the Cuba Program, the Cuba Project, and/or the Cuba ICT Project;

c. failing to conduct, and adjust as necessary, counterintelligence education and training based on the threat level in Cuba, including the "program requirements at post" as reflected in the Security Environment Threat List (SETL);

d. failing to maintain security and counterintelligence oversight in Cuba, including failing to provide proper oversight of the USAID Counterintelligence program, and failing to share all appropriate information with the appropriate agencies;

e. failing to allow for appropriate review of travel assignments to critical threat posts like Cuba and thus allow for appropriate awareness training before departure.

123.    Upon information and belief, Defendant United States also:

a.  failed to educate Mr. Gross on the threat posed by Cuba intelligence to USAID operations in Cuba, including failing to make him aware of the techniques used by Cuban government intelligence;

b.  failed to develop and conduct travel related pre-briefings and debriefings for Mr. Gross; and

c.  failed to conduct counterintelligence training for Mr. Gross.

124.   Upon information and belief, Defendant United States failed to fulfill its obligations under the Cuba Task Order. Specifically, USAID:

a.  failed to redirect activities as necessary based on program requirements. *See* Cuba Task Order at C.2.L(D); and

b.  failed to provide technical oversight to [DAI] through its designated [Cognizant Technical Officer]." *See Id.* at 29.

125.   Defendant United States further failed to take action even after being informed of Mr. Gross' own concerns through his trip memoranda.

126.   According to press reports, as a result of Mr. Gross' imprisonment, USAID has altered the Cuba Program to avoid the use of satellite equipment of the type used by Mr. Gross and to restrict the program to items available on the island.

127.   Effective January 23, 2012, after Mr. Gross' detention, USAID implemented an automated directive for overseas contractors requiring that contractors who are "cleared for access to classified information are given a local/Mission security briefing upon arrival, and prior to departure, a debriefing to ensure that they understand security requirements."  ADS Section 568.3.5.7.

**E.      The Immense and Continuing Harm to Plaintiffs Due to Defendants' Tortious Conduct.**

128.     Mr. Gross remains incarcerated in Cuba in a 10-by-12 foot room that he shares with two other inmates. Since his imprisonment began in December 2009, Mr. Gross has suffered physically and emotionally. He was subjected to extensive interrogation, sleep deprivation, and other psychological abuse. He has lost over 100 pounds, battled chronic arthritis pain, developed a tumor beneath his shoulder blade, and experienced increased difficulty in walking. He also has experienced severe emotional distress being separated from his family for almost three years, from his existing injuries, and from his continuing fear for his own safety while he remains in Cuban captivity.

129.     Mr. and Mrs. Gross likewise have suffered significant economic losses due to Mr. Gross's wrongful arrest and continuing wrongful detention. These economic losses include, but are not limited to: (a) the destruction of Mr. Gross's business; (b) lost income that both Plaintiffs have suffered, and that they will suffer in the future, including any amounts that still may be owed to Mr. Gross under his contract with DAI; (c) past and future legal fees and related expenses; (d) past and future medical expenses for Mrs. Gross; and (e) future medical expenses for Mr. Gross.

130.     Both Mr. Gross and Mrs. Gross also have suffered a loss of each other's society, affection, assistance and fellowship as a result of the injuries inflicted on Mr. Gross by Defendants' tortious conduct.

131.     As set forth below, Defendant DAI and Defendant United States each are jointly and severally liable for these damages.[4]

---

[4] Simultaneously with the filing of this tort complaint, Plaintiffs have filed a lawsuit in the U.S. District Court for the District of Maryland, seeking a declaratory judgment, and damages for breach of contract and insurance bad faith, against Federal Insurance Company ("Federal"), which issued an insurance policy under which Plaintiffs are

**F.      Procedural History of Claims Against United States**

132.    On December 2, 2011, within two years of Mr. Gross' detention in Cuba, Mr. and

Mrs. Gross each filed administrative claims with USAID under the Federal Tort Claims Act

("FTCA"). True and correct copies of the claims are attached hereto as Exhibit A.

133.    On May 22, 2012, Mr. and Mrs. Gross received a letter from USAID denying their

administrative claims. A true and correct copy of the letter is attached hereto as Exhibit B.

134.    Defendant United States, through USAID, premised its denial of Plaintiffs'

administrative claims solely on the so-called "foreign country" exception to the FTCA, 28

U.S.C. § 2680(k). *See* Exhibit B.

135.    The "foreign country" exception is not applicable here. Specifically, the Supreme

Court's interpretation of the foreign country exception, in *Sosa v. Alvarez v. Machain,* 542 U.S.

692 (2004), does not preclude the claims asserted here because:

a.   Plaintiff Alan Gross is a United States citizen born and raised in this country, who

was injured while working with Defendant United States as part of its effort to

achieve the objective of increasing internet access in Cuba; unlike in *Sosa*, Mr. Gross

is not a foreign national plaintiff who helped to prolong the torture, which ultimately

resulted in death, of a United States Drug Enforcement Agency ("DEA") agent;

b.   Unlike in *Sosa*, where even some of the challenged conduct of Defendant United

States – and not just the resulting injury – occurred in Mexico (where the DEA sent

its agents to capture Mr. Sosa), all of USAID's tortious conduct alleged here occurred

---

"Insureds" (the "First-Party Coverage Lawsuit")  The First-Party Coverage Lawsuit involves pure insurance coverage, contract interpretation issues that are wholly independent of the tort liability and damages issues in this case.  In the First-Party Coverage Lawsuit, Plaintiffs, as Insureds who have direct rights under the policy, seek coverage for certain of the expenses that they have incurred in connection with the wrongful detention of Mr. Gross. Plaintiffs' entitlement to such coverage will turn on the interpretation of various terms and conditions of the insurance contract at issue there; the conduct of Defendants DAI and United States, and of Plaintiffs, will not be at issue.

in the United States and, upon information and belief, at USAID's Washington, D.C. headquarters;

c.   Unlike in *Sosa*, Mr. Gross's co-plaintiff, his wife Judith Gross, has sustained all of her harm and losses related to her husband's wrongful detention here in the United States; in *Sosa*, the Supreme Court did not apply the foreign country exception to loss of consortium claims; and

d.   Cuban law will not apply to Plaintiffs' claims; thus, as noted by Justice Ginsburg and Justice Breyer in their concurring opinion in *Sosa*, the underlying rationale for the "foreign country exception," as reflected in, among other things, the legislative history of the FTCA, does not apply in this case.

## FIRST CLAIM FOR RELIEF
### (Negligence against the United States as to Alan Gross)

136.   Plaintiffs hereby incorporate Paragraphs 1 through 135 of this Complaint.

137.   Defendant United States had a duty to take basic remedial measures to protect Mr. Gross based on its superior knowledge, which Mr. Gross did not possess, about specific risks that Mr. Gross faced due to his participation in the Cuba ICT project. Among other things, Defendant United States had a duty to take the remedial measures that it failed to take as set forth in paragraphs 121 through 124 *supra*.

138.   Defendant United States failed to take any of those actions, even after being informed of Mr. Gross' own concerns through his trip memoranda.

139.   Defendant United States' breaches of its duties were a direct and proximate cause of Mr. Gross' detention and imprisonment in Cuba and the injuries and damages suffered as a result.

140.    As a proximate result of Defendant United States' negligent actions and omissions, Mr. Gross has endured, and will continue to endure, severe pain and suffering, and he has been prevented from pursuing his usual and customary activities. He has also suffered economic damages, including, but not limited to, loss of past and future income and expenses for future medical care.

### SECOND CLAIM FOR RELIEF
#### (Negligence against DAI as to Alan Gross)

141.    Plaintiffs hereby incorporate Paragraphs 1 through 140 of this Complaint.

142.    Any exculpatory, hold harmless, or limitation of liability clauses in the Subcontract are unenforceable because, among other reasons, the transaction affects the public interest and the clauses violate public policy.

143.    Defendant DAI had a duty to take basic remedial measures to protect Mr. Gross based on its superior knowledge, which Mr. Gross did not possess, about specific risks that Mr. Gross faced due to his participation in the Cuba ICT project. Among other things, Defendant had a duty to take the remedial measures that it failed to take as set forth in paragraph 118 *supra*.

144.    Defendant DAI failed to take any of these actions, even after being informed of Mr. Gross' own concerns through his trip memoranda.

145.    Defendant DAI's breaches of its duties were a direct and proximate cause of Mr. Gross' detention and imprisonment in Cuba and the injuries and damages suffered as a result.

146.    As a proximate result of Defendant DAI's negligent actions and omissions, Mr. Gross has endured, and will continue to endure, severe pain and suffering, and he has been prevented from pursuing his usual and customary activities. He has also suffered economic damages including but not limited to loss of past and future income and expenses for future medical care.

## THIRD CLAIM FOR RELIEF
### (Gross Negligence against DAI as to Alan Gross)

147.   Plaintiffs hereby incorporate Paragraphs 1 through 146 of this Complaint.

148.   Defendant DAI had the duties to Mr. Gross described in paragraph 143 *supra*.

149.   Defendant DAI, with gross negligence and willful disregard of Mr. Gross' rights, breached all of the above duties by failing to take the necessary actions as detailed in paragraphs 118 through 120 *supra*.

150.   Defendant DAI, with utter indifference to Mr. Gross' rights, ignored both its superior knowledge of the risks facing Mr. Gross and Mr. Gross' own expressions of concern regarding the project, because DAI was, upon information and belief, more concerned about the financial gain it could realize by taking risks in order to complete the project.

151.   Consequently, Defendant DAI failed to take any action to address Mr. Gross' expressions of concern in his multiple trip memoranda, and instead DAI pressured him to complete the project.

152.   Defendant DAI's breaches of its duties were a direct and proximate cause of Mr. Gross' detention and imprisonment in Cuba and the injuries and damages suffered as a result.

153.   As a proximate result of Defendant DAI's negligent actions and omissions, Mr. Gross has endured, and will continue to endure, severe pain and suffering, and he has been prevented from pursuing his usual and customary activities. He has also suffered economic damages including but not limited to loss of past and future income and expenses for future medical care.

## FOURTH CLAIM FOR RELIEF
### (Negligent Infliction of Emotional Distress against the United States as to Alan Gross)

154.   Plaintiffs hereby incorporate Paragraphs 1 through 153 of this Complaint.

155.    Defendant United States' negligence, as outlined in more detail *supra*, has caused injuries to Mr. Gross, and has placed him in a zone of physical danger resulting from his imprisonment, such that he has feared, and continues to fear, for his own physical safety.

156.    Due to Mr. Gross' injuries, as referenced above, that have resulted from his wrongful detention, and that are a proximate result of Defendant United States' negligence, Mr. Gross also has suffered and continues to suffer severe emotional distress.

157.    Moreover, due to Defendant United States' tortious conduct, Mr. Gross remains in a "zone of physical danger," (i.e., captivity by the Cuban government), and, as a result, Mr. Gross has suffered and will continue to suffer severe emotional distress – namely, fear for his safety in the future.

## FIFTH CLAIM FOR RELIEF
### (Negligent Infliction of Emotional Distress against DAI as to Alan Gross)

158.    Plaintiffs hereby incorporate Paragraphs 1 through 157 of this Complaint.

159.    Defendant DAI's negligence, as outlined in more detail *supra*, has caused injuries to Mr. Gross, and placed him in a zone of physical danger resulting from his imprisonment, such that he has feared, and continues to fear, for his own physical safety.

160.    Due to Mr. Gross' injuries, as referenced above, that have resulted from his wrongful detention, and that are a proximate result of Defendant DAI's negligence, Mr. Gross also has suffered and continues to suffer severe emotional distress.

161.    Moreover, due to Defendant DAI's tortious conduct, Mr. Gross remains in a "zone of physical danger," (i.e., captivity by the Cuban government), and, as a result, Mr. Gross has suffered and will continue to suffer severe emotional distress – namely, fear for his safety in the future.

**SIXTH CLAIM FOR RELIEF**
**(<u>Grossly Negligent Infliction of Emotional Distress against DAI as to Alan Gross</u>)**

162.    Plaintiffs hereby incorporate Paragraphs 1 through 161 of this Complaint.

163.    Defendant DAI's gross negligence, as outlined in more detail *supra*, has caused injuries to Mr. Gross, and placed him in a zone of physical danger resulting from his imprisonment, such that he has feared, and continues to fear, for his own physical safety.

164.    Due to Mr. Gross' injuries, as referenced above, that have resulted from his wrongful detention, and that are a proximate result of Defendant DAI's negligence and gross negligence, Mr. Gross also has suffered and continues to suffer severe emotional distress.

165.    Moreover, due to Defendant DAI's tortious conduct, Mr. Gross remains in a "zone of physical danger," (i.e., captivity by the Cuban government), and, as a result, Mr. Gross has suffered and will continue to suffer severe emotional distress – namely, fear for his safety in the future.


**SEVENTH CLAIM FOR RELIEF**
**(<u>Loss of Consortium against the United States and DAI as to Alan Gross and Judith Gross</u>)**

166.    Plaintiffs hereby incorporate Paragraphs 1 through 165 of this Complaint.

167.    Mr. Gross has suffered injuries proximately caused by Defendants' negligence and gross negligence.

168.    Mr. and Mrs. Gross are currently married and were married at the time Mr. Gross' injuries were initially suffered, i.e., at the time of Mr. Gross' wrongful arrest.

169.    As a result of the injuries suffered by Mr. Gross due to Defendants' tortious conduct, both Mr. Gross and Mrs. Gross have suffered a loss of each other's society, affection, assistance and fellowship.

## EIGHTH CLAIM FOR RELIEF
### (Punitive Damages against DAI)

170.    Plaintiffs hereby incorporate Paragraphs 1 through 169 of this Complaint.

171.    DAI acted recklessly and with willful disregard toward Mr. Gross' rights and safety. Specifically, DAI's actions include but are not limited to the following:

a.   DAI failed to take basic remedial steps to protect Mr. Gross from harm, which DAI knew to be necessary, because doing so would have delayed or prevented DAI's complete performance under part of a lucrative contract with Defendant United States, thereby depriving Defendant DAI of significant revenue.

b.   DAI ignored both its superior knowledge of the risks facing Mr. Gross and Mr. Gross' own expressions of concern regarding the project, because DAI, upon information and belief, was more concerned about the financial gain it could realize by taking risks in order to complete the project, including risks to Mr. Gross' safety. Specifically, upon information and belief, Defendant DAI was concerned about the "potential for financial loss by DAI in the event that [Mr. Gross] fail[ed] to complete the work."

c.   Based on its pecuniary interests, DAI failed to take any action to address Mr. Gross' expressions of concern in his multiple trip reports, and instead pressured him to complete the project or else find someone else who could.

d.   Not only did DAI fail to take any action to protect Mr. Gross, it advocated for an extension and expansion of the Cuba ICT Project, after which Mr. Gross was detained in Cuba.

## REQUEST FOR RELIEF

WHEREFORE, Mr. and Mrs. Gross seek judgment as follows:

a.      That judgment be entered against the Defendants, jointly and severally, and in favor of Mr. and Ms. Gross for compensatory damages as may be awarded at trial;

b.      For an award of punitive damages against DAI in connection with the Eighth Claim for Relief;

c.      For an award of costs, expenses and reasonable attorneys' fees incurred in prosecuting this action; and

d.      For such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs hereby request trial by jury as to DAI.

Dated: November 16, 2012                                Respectfully submitted,


By:/s/     Ivan J. Snyder
Scott D. Gilbert, D.C. Bar No. 290932
Barry Buchman, D.C. Bar No. 459663
Ivan J. Snyder, D.C. Bar No. 498461
Emily Grim, D.C. Bar No. 1006597
**GILBERT LLP**
1100 New York Ave. NW, Suite 700
Washington, DC 20005
Telephone:  (202) 772-2200
Facsimile:  (202) 772-3333
gilberts@gotofirm.com
buchmanb@gotofirm.com
snyderi@gotofirm.com
grime@gotofirm.com

*Attorney for Plaintiffs Alan Gross and Judith Gross*