**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**ALAN GROSS and JUDITH GROSS,**

      **Plaintiffs,**

          **v.**

**DEVELOPMENT ALTERNATIVES, INC.**
**and UNITED STATES OF AMERICA,**

      **Defendants.**

                                          **Civil Action No. 12-1860 (JEB)**

---

**MEMORANDUM OPINION**

For three and a half years, American Alan Gross has wasted in a Cuban prison, convicted of "acts against the independence or territorial integrity of the state" for his work as a federal subcontractor. Another decade of imprisonment looms. Gross was arrested while bringing internet access to Jewish communities in Cuba, part of a collaboration between the U.S. Agency for International Development and its contractor Development Alternatives, Inc. to promote democracy in that nation. According to Gross, USAID and DAI understood the risks that his work entailed, but gave him inadequate warnings and training. He and his wife Judith thus sued, and DAI subsequently settled. The United States now moves to dismiss, asserting sovereign immunity. Because the Federal Government retains immunity for injuries suffered in foreign countries, the Court will grant the Motion.

**I.     Background**

As the Motion at issue is a motion to dismiss, the Court draws the facts from the Complaint, assuming them to be true at this stage. Passed and signed in 1996, the Cuban Liberty and Democratic Solidarity Act authorized support for democracy-building efforts in Cuba. <u>See</u>

Pub. L. No. 104-114, § 109, 110 Stat. 785, 799 (1996) (codified at 22 U.S.C. § 6039).  Among the agencies tasked with this democracy promotion was USAID.  See Compl., ¶ 20.  Its Cuba Program "was expressly designed to hasten Cuba's peaceful transition to a democratic society."  Id., ¶ 22 (internal quotation marks omitted).  In putting that Program into place, USAID often worked with contractor DAI.  See id., ¶¶ 35, 37.  This case arises out of their collaboration.

In late 2008, at USAID's request, DAI sought proposals for projects to increase internet and "new media" access in Cuba.  See id., ¶¶ 43-44, 48-49, 53-55, 60.  Alan Gross, who had worked with DAI in the past, responded with a bid to "train[] the Jewish community in Cuba on the use and maintenance of information and communication technologies ('ICTs') through, among other things, the use of mobile phones, wireless technologies, and personal computers."  Id., ¶¶ 52, 56-57.  DAI selected Gross's proposal and, with USAID's approval, entered a subcontract with his single-member LLC on February 10, 2009.  See id., ¶¶ 61-64.  The subcontract emphasized that in performing the project, "time is of the essence."  Id., ¶ 67.  DAI directly oversaw the project, but was required to regularly update USAID, which retained ultimate control.  See id., ¶¶ 45-47, 65, 68-74.

Gross traveled to Cuba four times in mid-2009, each time staying in a different Cuban Jewish community for one to two weeks.  See id., ¶¶ 59, 77, 84, 94-95, 101.  At each project site, he would "establish[] internet connections using multiple redundant devices in order to improve intra and intergroup communications channels" and then train those in the Cuban Jewish community "to use ICT devices to connect to the internet so that they can have regular and direct contact with each other and with [Gross]."  Id., ¶ 66 (quoting subcontract).  These new internet connections undercut the Cuban government's censorship.  See id.  After each of his four trips, Gross wrote a new memo to DAI (which was always shared with USAID) warning of the

riskiness of this covert work and the perils if caught.  See id., ¶¶ 77-79, 84-86, 95-96, 101-03.

Despite these dangers, Gross and DAI (with USAID's approval) agreed to extend the project.

See id., ¶¶ 73, 108-09, 111.

Gross left for his fifth trip to Cuba on November 23, 2009.  See id., ¶ 112.  On December

3, the night before he was to return to the United States, Cuban authorities arrested him.  See id.

He was initially held as a political prisoner, where he was extensively interrogated and

psychologically abused.  See id., ¶ 114.  Only in February 2011 was he finally charged with a

crime: "acts against the independence or territorial integrity of the state."  See id., ¶ 113.

Following a summary trial in which the Cuban court determined that he had "participated in 'a

subversive project of the U.S. government that aimed to destroy the Revolution through the use

of communications systems out of the control of Cuban authorities,'" Gross was convicted on

March 11, 2011, and handed a 15-year sentence.  Id., ¶ 115 (brackets omitted).  Three and a half

years after his arrest, Gross lives in harrowing conditions, with little hope of improvement:

> Mr. Gross resides in a 10-by-12 foot room with two other inmates,
> he has lost over 100 pounds, and he is battling chronic arthritis
> pain and what appears to be a cancerous tumor beneath his
> shoulder blade.  His business and career have been destroyed, and
> his family has been deprived of their primary wage earner. . . .
> While Mr. Gross remains confined in Cuba, his oldest daughter has
> been battling breast cancer and his mother has been suffering from
> terminal lung cancer.  At this time, there are no indications that
> Mr. Gross will return to his family within the next decade.

Id. at 3-4; see also id., ¶¶ 128-31.  Despite diplomatic efforts, so far the United States has failed

to secure Gross's release.  See Mot. at 1-2.

According to Plaintiffs, better precautions by DAI and USAID could have averted

Gross's incarceration.  Although DAI and USAID understood the risks and dangers he faced,

they never fully disclosed those risks, trained him on how to minimize them, or provided

additional protection.  See Compl., ¶¶ 75, 118, 121, 123.  Nor did they heed the warnings Gross

gave after all four trips.  See id., ¶¶ 120, 125.  Instead, they repeatedly let him return to Cuba.

See id., ¶¶ 118(d), 121(d).  USAID, moreover, ignored various manuals, directives, and

agreements on disclosure and training.  See id., ¶¶ 121(e), 122, 124.  All of these failings

undergird this lawsuit.

     After exhausting administrative remedies, see id., ¶¶ 132-33, Gross and his wife Judith

filed suit against DAI (negligence, gross negligence, and negligent and grossly negligent

infliction of emotional distress as to Alan; loss of consortium as to both) and the United States

(negligence and negligent infliction of emotional distress as to Alan; loss of consortium as to

both).  See id., ¶¶ 136-171.  Both Defendants moved to dismiss.  Before the filing of DAI's

Reply, however, Plaintiffs and DAI notified the Court that they had settled and expect DAI's

dismissal shortly.  The United States' Motion is now ripe.

## II.  Legal Standard

     Under Federal Rule of Civil Procedure 12(b)(1), a court must dismiss a claim for relief

when the complaint "lack[s] . . . subject-matter jurisdiction."  To survive a motion to dismiss

under Rule 12(b)(1), Plaintiffs bear the burden of proving that the Court has subject-matter

jurisdiction to hear their claims.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992);

U.S. Ecology, Inc. v. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).  A court has an

"independent obligation to determine whether subject-matter jurisdiction exists, even in the

absence of a challenge from any party."  Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006).

"For this reason 'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny

in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim."

Grand Lodge of the Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13-14 (D.D.C.

2001) (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350

(2d ed. 1987) (alteration in original)).  Additionally, unlike with a motion to dismiss under Rule 12(b)(6), the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." Jerome Stevens Pharm. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005); see also Venetian Casino Resort, LLC v. EEOC, 409 F.3d 359, 366 (D.C. Cir. 2005) ("given the present posture of this case – a dismissal under Rule 12(b)(1) on ripeness grounds – the court may consider materials outside the pleadings"); Herbert v. Nat'l Acad. of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992).

**III.    Analysis**

"Sovereign immunity is jurisdictional in nature," and "[a]bsent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." FDIC v. Meyer, 510 U.S. 471, 475 (1994).  In suing the United States here, Plaintiffs rely on the waiver in the Federal Tort Claims Act, which usually makes the Federal Government liable for tort claims "in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 2674; see also 28 U.S.C. § 1346(b)(1) (granting jurisdiction over such claims).  The Act retains sovereign immunity for certain categories of claims, however, including "[a]ny claim arising in a foreign country."  28 U.S.C. § 2680(k).  This exception, predictably, has spawned litigation over where a claim "aris[es]."  The Supreme Court put that confusion to bed a decade ago in Sosa v. Alvarez-Machain, 542 U.S. 692 (2004), "hold[ing] that the FTCA's foreign country exception bars all claims based on any injury suffered in a foreign country, regardless of where the tortious act or omission occurred."  Id. at 712.

Because Plaintiffs' injuries here stem from Gross's imprisonment in Cuba, the foreign-country exception would seem to apply.  Plaintiffs nonetheless toss out a hodgepodge of statutory and constitutional arguments in a determined effort to overcome the exception.  As

cataloged below, however, the Supreme Court or D.C. Circuit has already considered and

rejected each statutory bypass, and while the constitutional gambit is novel, it ultimately fails as

well.

    A.  <u>Statutory Arguments</u>

    Plaintiffs first suggest that, because USAID's negligent direction and oversight occurred

in the United States, the foreign-country exception should not apply.  <u>See</u> Opp. at 2 ("Gross was

arrested by the Cuban government solely as a result of his work on a U.S. Government project,

which Defendant United States funded and oversaw entirely from Washington, D.C.").  But that

line of reasoning is precisely what <u>Sosa</u> rejected:

> Some Courts of Appeals, reasoning that "the entire scheme of the
> FTCA focuses on the place where the negligent or wrongful act or
> omission of the government employee occurred," <u>Sami v. United
> States</u>, 617 F. 2d 755, 761 (CADC 1979), have concluded that the
> foreign country exception does not exempt the United States from
> suit "for acts or omissions occurring here which have their
> operative effect in another country," <u>id.</u>, at 762 (refusing to apply
> § 2680(k) where a communique sent from the United States by a
> federal law enforcement officer resulted in plaintiff's wrongful
> detention in Germany).  Headquarters claims typically involve
> allegations of negligent guidance in an office within the United
> States of employees who cause damage while in a foreign country,
> or of activities which take place within a foreign country.  In such
> instances, these courts have concluded that § 2680(k) does not bar
> suit. . . .
>
>     The potential effect of this sort of headquarters analysis
> flashes the yellow caution light.  "It will virtually always be
> possible to assert that the negligent activity that injured the
> plaintiff abroad was the consequence of faulty training, selection or
> supervision – or even less than that, lack of careful training,
> selection or supervision – in the United States." <u>Beattie v. United
> States</u>, 756 F. 2d 91, 119 (CADC 1984) (Scalia, J., dissenting). . . .
> The headquarters doctrine threatens to swallow the foreign country
> exception whole, certainly at the pleadings stage.

542 U.S. at 701-03 (footnote, some citations, internal quotation marks, and brackets omitted); <u>see also</u> <u>id.</u> at 710, 712 ("headquarters analysis should have no part in applying the foreign country exception").

Plaintiffs next float an argument based on congressional intent.  In <u>Sosa</u>, the Court explained that "[w]hen the FTCA was passed, the dominant principle in choice-of-law analysis for tort cases was *lex loci delicti*: courts generally applied the law of the place where the injury occurred."  <u>Id.</u> at 705.  Foreign law, under that traditional principle, determines liability for an injury suffered abroad.  "The application of foreign substantive law . . . was, however, what Congress intended to avoid by the foreign country exception."  <u>Id.</u> at 707.  This case is different, Plaintiffs argue, because modern D.C. choice-of-law rules would apply <u>D.C.</u> tort law; as a result, trotting out the foreign-country exception here is not necessary to effect Congress's intent.  Once again, the <u>Sosa</u> Court contemplated the same argument for permitting the headquarters doctrine "when a State's choice-of-law approach would not apply the foreign law of place of injury."  <u>Id.</u> at 711.  Yet the Court rejected such an atextual exception:  "The point would be well taken, of course, if Congress had written the exception to apply when foreign law would be applied.  But that is not what Congress said."  <u>Id.</u>

Even if the foreign-country exception bars recovery for some injuries, Plaintiffs contend it should not bar <u>all</u> of their claims: How, they argue, could the exception proscribe recovery for loss of consortium in the United States, Judith Gross's only alleged injury?  <u>See</u> Opp. at 12-13.  But this, too, is an argument higher courts have seen and dealt with.  In <u>Harbury v. Hayden</u>, 522 F.3d 413 (D.C. Cir. 2008), the American widow of a Guatemalan rebel allegedly killed by the CIA sued the United States for emotional distress:

> [T]o the extent Harbury alleges her own emotional injuries in the
> United States as a result of the death of her husband, those

> derivative claims similarly arise in Guatemala for purposes of the
> FTCA because they are based entirely on the injuries her husband
> suffered there.  A plaintiff in Harbury's situation cannot plead
> around the FTCA's foreign-country exception simply by claiming
> injuries such as "emotional distress" that are derivative of the
> foreign-country injuries at the root of the complaint.  Much like the
> now-defunct "headquarters doctrine," that practice would threaten
> to "swallow the foreign country exception whole."  We follow the
> lead of Sosa and decline to allow this kind of creative pleading to
> water down the foreign-country exception to the FTCA.

Id. at 423 (citations omitted).

Plaintiffs, finally, suggest that all FTCA exceptions (including the foreign-country one)

must be construed narrowly because "'unduly generous interpretations of the exceptions run the

risk of defeating the central purpose of the statute, which waives the Government's immunity

from suit in sweeping language.'"  Opp. at 10 (quoting Dolan v. U.S. Postal Serv., 546 U.S. 481,

492 (2006) (citation and internal quotation marks omitted)).  The Dolan Court itself, however,

instructed that "the proper objective of a court attempting to construe one of the subsections of

28 U.S.C. § 2680 is to identify those circumstances which are within the words and reason of the

exception – no less and no more."  546 U.S. at 492 (internal quotation marks omitted).  In any

event, there is nothing for the Court to "construe" here.  Binding precedent has already

interpreted the foreign-country exception to foreclose claims for injuries suffered abroad.  The

Court is obliged to follow suit.

    B.  Constitutional Argument

In a last-ditch stab to pierce the United States' immunity, Plaintiffs invoke the Equal

Protection Clause.  They argue that the Government has no justification for excluding them from

the FTCA because "the sole basis for the foreign country exception – avoiding application of

foreign law to the United States in FTCA cases – is wholly inapplicable."  Opp. at 13.  Despite

the Government's protests, Plaintiffs did not need to raise this argument in their Complaint to

preserve it.  The Federal Rules call for a "short and plain statement of the grounds for the court's

jurisdiction," not a subsection-by-subsection schlepp through § 2680.  See Fed. R. Civ. P. 8(a).

The Fourteenth Amendment's Equal Protection Clause requires that "[n]o State shall . . .

deny to any person within its jurisdiction the equal protection of the laws."  That equal-

protection guarantee similarly constrains the Federal Government.  See Bolling v. Sharpe, 347

U.S. 497 (1954).  Plaintiffs agree that rational-basis scrutiny applies here, see Opp. at 14,

meaning that the Court must uphold the exception if it finds "a rational relationship between the

disparity of treatment and some legitimate governmental purpose."  Armour v. City of

Indianapolis, Ind., 132 S. Ct. 2073, 2080 (2012) (citation omitted).  Constitutional challenges

reviewed under this relaxed standard face an uphill climb:

> On rational-basis review, a classification in a statute . . . comes
> to us bearing a strong presumption of validity, and those attacking
> the rationality of the legislative classification have the burden to
> negative every conceivable basis which might support it.
> Moreover, because we never require a legislature to articulate its
> reasons for enacting a statute, it is entirely irrelevant for
> constitutional purposes whether the conceived reason for the
> challenged distinction actually motivated the legislature. . . .  [A]
> legislative choice is not subject to courtroom factfinding and may
> be based on rational speculation unsupported by evidence or
> empirical data.

FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 314-15 (1993) (citations and internal quotation

marks omitted).

At the outset, Plaintiffs' challenge poses the wrong question.  The Equal Protection

Clause demands a rational basis for the line drawn by the statute (i.e., injuries abroad vs. injuries

here) – not one for the carve-out Plaintiffs seek (i.e., injuries to U.S. citizens abroad when

domestic law would apply vs. when it would not).  See, e.g., Armour, 132 S. Ct. at 2079-80 ("As

long as the City's distinction has a rational basis, that distinction does not violate the Equal

Protection Clause.") (emphasis added).  And § 2680(k)'s distinction between domestic and

foreign injuries clearly has that rational basis: protecting the United States' coffers from the whims of foreign law.  See Sosa, 542 U.S. at 707 (§ 2680(k) "codified Congress's 'unwillingness to subject the United States to liabilities depending upon the laws of a foreign power'") (quoting United States v. Spelar, 338 U.S. 217, 221 (1949)) (brackets omitted).  Such foreign law would govern because "[w]hen the FTCA was passed . . . courts generally applied the law of the place where the injury occurred."  Id. at 705.  While that "traditional approach to choice of substantive tort law has lost favor," a "good many States" retain it. Id. at 708-09.

Even under Plaintiffs' framing of the equal-protection inquiry – as applied to a U.S. citizen injured abroad where domestic law would control the tort liability – § 2680(k) passes muster.  As courts have long recognized, the foreign-country exception protects the United States from particularly burdensome litigation.  See Burna v. United States, 240 F.2d 720, 722 (4th Cir. 1957) (reasons for § 2680(k) include "the absence of United States courts in such countries, with resulting problems of venue, and the difficulty of bringing defense witnesses from the scene of the alleged tort to places far removed"); see also Beattie, 756 F.2d at 116-17 (Scalia, J., dissenting) (same); Meredith v. United States, 330 F.2d 9, 10 (9th Cir. 1964) (same); Al-Zahrani v. Rumsfeld, 684 F. Supp. 2d 103, 119 (D.D.C. 2010) (same); Developments in the Law: Extraterritoriality, 124 Harv. L. Rev. 1226, 1265 (2011) (same).  Lawsuits about foreign injuries will often prove complicated and costly: evidence may be hard to collect and witnesses may be much more difficult to procure.  Documenting Gross's damages here is made far trickier by the fact that Gross was injured in Cuba – instead of, say, Colorado.  Obtaining the testimony of Cuban prison officials, for example, hardly seems a simple task.  The foreign/domestic filter is imperfect, of course: suits over foreign injuries are sometimes simple, and suits over domestic injuries can be complicated by countless circumstances.  Yet rational-basis scrutiny tolerates

such imperfection.  See Vance v. Bradley, 440 U.S. 93, 108 (1979) ("Even if the classification involved here is to some extent both underinclusive and overinclusive, and hence the line drawn by Congress imperfect, it is nevertheless the rule that in a case like this perfection is by no means required.") (internal quotation marks omitted).  Avoiding onerous litigation is a legitimate governmental purpose, and by foreclosing all litigation over injuries suffered abroad, the foreign-country exception rationally advances that purpose.

As the background section of this Opinion hopefully makes clear, the Court is in no way condoning what happened to Gross or implying he is to blame.  Sympathy with his plight, however, is not a basis on which to circumvent clear precedent concerning the FTCA.  The FTCA exceptions "mark the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals."  Molzof v. United States, 502 U.S. 301, 311 (1992) (internal quotation marks omitted).  As Gross's injuries here fall within the foreign-country exception, dismissal is the only warranted course.

## IV.     Conclusion

For the aforementioned reasons, the Court will grant the Government's Motion to Dismiss.  A separate Order consistent with this Opinion will be issued this day.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  May 28, 2013

11